UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EDWARD OTTO RUEMENAPP,

          Plaintiff,          Case No. 16-cv-11991

v.          Honorable Thomas L. Ludington

OSCODA TOWNSHIP, et al.,

          Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Edward Ruemenapp filed a complaint on June 1, 2016, alleging that Defendants Township of Oscoda, Officer Greg Alexander, and Officer Gerald Sobolewski violated his constitutional rights while arresting him. Compl., ECF No. 1. The Complaint contains the following claims: excessive force, unreasonable seizure, false arrest, malicious prosecution, and failure to train. On March 28, 2017, the parties submitted a stipulated dismissal of Counts II, III, IV, and V of the Complaint. ECF No. 20. Accordingly, the only remaining claims are the allegations that the officer Defendants used excessive force and the allegation that the City of Oscoda failed to train and/or supervise its officers so as to prevent violations of constitutional rights. On April 6, 2017, Defendants filed a motion for summary judgment on the remaining counts. ECF No. 21. For the following reasons, that motion will be granted.

**I.**

The following facts are undisputed. Ruemenapp is the owner and operator of the Oscoda Resort and Motel. Ruemenapp Dep. at 6, ECF No. 21, Ex. C. Residents at the Motel often stay for extended periods of time. *See id.* at 68–69; Sobolewski Dep. at 13, ECF No. 21, Ex. B. Oscoda Township Officers Greg Alexander and Gerald Sobolewski received a report of a

landlord/tenant dispute at the Motel during the evening of February 2, 2015. Alexander Dep. at 29, ECF No. 21, Ex. A. When the officers arrived, they met Kristina Reker and her grandfather. *Id.* at 30–31. Ms. Reker explained that she was a current tenant of the Motel, but that her landlord had changed the locks to her apartment and was refusing to allow her access to her personal property within the unit. *Id.* at 31–32. Ms. Reker told the officers that she had paid rent through March 1st. *Id.* at 32.

The officers attempted to enter the apartment and found it locked. *Id.* at 36. They then started looking for the landlord, Mr. Ruemenapp. *Id.* at 34. They eventually made contact with Ruemenapp outside his house. *Id.* at 35. When the conversation began, Ruemenapp was calm and collected. At this point, the stories begin to diverge.

### A.

### 1.

According to Alexander, he and his partner began questioning Ruemenapp about the dispute with Ms. Reker. During the conversation, Ruemenapp was standing several feet away from the two officers. *Id.* at 43–44. But Ruemenapp "became belligerent quickly, starts screaming obscenities that she was not going back into that apartment." *Id.* at 38. Ruemenapp admitted to the officers that Ms. Reker's rent was current. *Id.* at 41. However, Ruemenapp asserted that, because Ms. Reker had been gone for three days, she had abandoned the apartment. *Id.* Alexander testified at his deposition to his belief that, based on his training and experience, leaving your apartment for three days does not constitute abandonment. *Id.* at 41–42. When the officers indicated that Ruemenapp was required to let Ms. Reker into her apartment, the confrontation escalated further. Ruemenapp continued shouting obscenities at the top of his lungs. *Id.* at 43. He then took a step forward and pointed his finger (or fingers) in Officer

Sobolewski's face. *Id.* at 44. As Alexander described it, Ruemenapp "extends his arm and is extremely close to Officer Soboleski's [sic] face, more or less pointing at him, jabbing towards his face as he explains himself." *Id.* At this point, Ruemenapp's hand was approximately six inches from Sobolewski's face. *Id.* at 45. Both officers began instructing Ruemenapp to remove his hand from Sobolewski's face. *Id.* at 46, 48–49. Instead of complying, Ruemenapp pointed his fingers at Sobolewski several more times. *Id.* at 47. At one point, Ruemenapp's hand got close enough to Sobolowski that he flinched. *Id.* at 46.

After the second or third time that Ruemenapp pointed directly into Sobolewski's face (and ignored orders to put his hands down), Alexander believed that Ruemenapp was going to strike Sobolewski. *Id.* at 49. To prevent that, Alexander "grabbed his arm and pulled it behind his back and informed him that he was being placed under arrest." *Id.* Ruemenapp immediately began struggling against Alexander. *Id.* at 68. Because Ruemenapp refused to go willingly into handcuffs, Sobolewski grabbed his other arm and Alexander used a "transport wristlock," which is a "joint lock of the wrist" used to control unruly individuals. *Id.* at 50. Using the leverage obtained by the wristlock, Alexander pushed Ruemenapp's upper body against the exterior wall of the apartment complex in order to handcuff him. *Id.* at 50–51.

The wall was made of a rough wood and, after he finished cuffing Ruemenapp, Alexander noticed that Ruemenapp had sustained an abrasion to his face. Alexander believes that the abrasion was sustained because Ruemenapp was "moving his head back and forth, attempting to negotiate with myself and Officer Sobolewski [sic] about going to jail." *Id.* at 52.

At this point, Ruemenapp was placed in the patrol car. *Id.* at 56. After being handcuffed, Ruemenapp was no longer belligerent. *Id.* Before leaving the Motel, the officers directed Ruemenapp's daughter to unlock Ms. Reker's apartment. *Id.* at 58. Inside, Alexander spotted

"items on the floor," including clothing. *Id.* The transport to the police station and booking proceeded without incident. Ruemenapp was charged with disorderly conduct and resisting and obstructing arrest.[1]

**2.**

In his deposition, Ruemenapp confirmed certain key details of the officers' account. He admitted that Ms. Reker had paid her rent through March 1st, that he had changed the locks, and that he was refusing to allow her to enter the apartment. Ruemenapp Dep. at 74, 81–82. He further confirmed that Ms. Reker still had some personal belongings in the apartment. *Id.* at 70–72. Ruemenapp also acknowledged that he refused to allow the officers to enter the apartment. *Id.* at 81. Although, as discussed below, Ruemenapp denied using certain obscenities, he did admit that he called Ms. Reker by at least one obscenity. *See id.* at 82 ("At one point I said, 'that bitch has no business even being here.'").

In his deposition, Ruemenapp repeated his belief that Ms. Reker had abandoned the apartment. *Id.* at 66–67, 80–81. He explained that Ms. Reker had told Ruemenapp's daughter that she was moving out of the apartment approximately a week before the incident occurred. *Id.* at 66–67. Ruemenapp also stated that, when he changed the locks, he noted that the interior of the apartment had sustained significant damage, including holes in the wall. *Id.* at 70–71.

Ruemenapp denied several details of the officers' account. First, he accused Alexander of blocking Ruemenapp from returning to his home after Ruemenapp initially refused to allow the officers to enter Ms. Reker's apartment. *Id.* at 84–85. After attempting to enter his home and being denied access, Ruemenapp turned around, pointed at Ms. Reker's apartment, and said that Ms. Reker had no business there. *Id.* at 85. Alexander then told Ruemenapp: "'Don't put your

---

[1] Sobolewski corroborates his partner's account of the encounter with Ruemenapp in all meaningful ways. Sobolewski Dep. at 20–35.

finger in my partner's face.'" *Id.* Ruemenapp replied: "'I didn't stick my finger in your partner's face.'" *Id.* At this point, Alexander moved closer to Ruemenapp and reached for his hands. *Id.* at 85–86. Ruemenapp moved away from Alexander. *Id.* at 86. Sobolewski then informed Ruemenapp that he was under arrest and instructed him to put his hands behind his back. *Id.* Ruemenapp attempted to ask why he was being arrested, but only managed to say two words: "'What are'--." *Id.* at 87, 113.

At that point, Ruemenapp blacked out. *Id.* at 87. When he regained consciousness, he was "pinned against the wall, with my cheek against the wall." *Id.* The officers told him to stop resisting, and Ruemenapp replied: "'I am not resisting.'" *Id.* at 88.

**3.**

The only other account of the event comes via the written declaration of James Merrit, a resident at the Motel. Merrit Decl. at 2, ECF No. 25, Ex. D. Merrit was not deposed. According to Mr. Merrit's declaration, he was in his apartment when the incident occurred. *Id.* Mr. Merrit did not "hear any yelling or talking coming from outside." *Id.* He saw Ruemenapp point in Ms. Reker's direction, and then saw an officer grab Ruemenapp and push him into a building. *Id.* In his declaration, Mr. Merrit asserts that although the officers repeatedly commanded Ruemenapp to stop resisting, he never saw aggressive or resistant behavior by Ruemenapp. *Id.* at 3.

**B.**

On September 21, 2015, Ruemenapp entered into a deferred prosecution agreement. Def. Pros. Agr., ECF No. 21, Ex. D. Pursuant to that agreement, the charges against Ruemenapp were dropped, subject to certain conditions. One of those conditions was as follows:

> Defendant admits that he did obstruct or oppose Greg Alexander, a police officer of the Oscoda Township Police Department that the defendant knew or had reason to know was performing his duties. Further, the People agree that should this

> agreement be violated by defendant and charges reinstated, that said admission will not be used against defendant in a subsequent trial.

*Id.*

### C.

At the time of the incident, both Alexander and Sobolewski had received "use of force" training within the last year. Alexander Dep. at 19; Sobolewski Dep. at 7. Alexander has never been suspended, terminated, or reprimanded. Alexander Dep. at 22. He has had one citizen complaint filed against him, related to a civil citation for running a red light. *Id.* at 21. The citizen at issue argued that he had not actually run the light. *Id.* at 22. Sobolewski has received one written warning for not completing a report within 72 hours. Sobolewski Dep. at 6. That warning was issued at Sobolewski's previous place of employment, the Alcona County Sheriff's Office. *Id.* While an officer with the Oscoda Township Police Department, Sobolewski has never been disciplined, reprimanded, terminated, or investigated. *Id.* at 5. No citizen complaints have been made against Sobolewski. *Id.*

### II.

Now before the Court is Defendants' motions for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw

all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**III.**

Defendants seek summary judgment on Plaintiff's remaining claims. First, Defendants argue that the officers' use of force in arresting Ruemenapp was reasonable as a matter of law. Defendants further argue that, even if the use of force was unreasonable, it was not clearly established as unlawful at the time of the arrest and thus the officers are entitled to qualified immunity. Finally, Defendants argue that Ruemenapp has provided no evidence of any custom, policy, or practice by the Township Defendant which contributed to any violation of Ruemenapp's rights.

A plaintiff proceeding under § 1983 must establish at least a genuine issue of fact on the question of whether a person acting under color of state law deprived him of a right secured by the Constitution or by federal law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The plaintiff must also demonstrate that the defendants are not entitled to qualified immunity. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id*. at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id*. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

**A.**

When an excessive force claim arises, as here, "in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment guarantees citizens the right to be free from "unreasonable" seizures, and thus the inquiry in

excessive force cases under the Fourth Amendment turns on whether the seizure was reasonable. *Id.* at 394–96. In determining whether a seizure was reasonable, the court must carefully balance the individual's Fourth Amendment interests against the "countervailing governmental interests at stake." *Id.* at 396. Relevant factors include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts must look to the totality of the circumstances, but must view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Importantly, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* In other words, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. There is thus "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

### 1.

To begin with, Ruemenapp does not appear to contend that his arrest itself was unlawful, simply that the force used in arresting him was unconstitutional. At best, Ruemenapp argues that, "at the moment excessive and/or unreasonable force was used, Plaintiff was not actively resisting

arrest or attempting to evade arrest by flight." Pl. Rep. Br. at 21, ECF No. 25. That assertion goes to the question of whether excessive force was used while arresting him, not whether the officers were justified in arresting him in the first place. And, indeed, Ruemenapp admitted in the Deferred Prosecution Agreement that he "did obstruct or oppose Greg Alexander, a police officer of the Oscoda Township Police Department that the defendant knew or had reason to know was performing his duties." Def. Pros. Agr. at 1.[2]

Plaintiff advances a confusing argument, premised on *Heck v. Humphrey*, whereby he attempts to argue that the admission in the Deferred Prosecution Agreement does not bar his claim as a matter of res judicata. 512 U.S. 477, 486–87 (1994). The *Heck* doctrine is as follows:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.*

Thus, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. In the context of an excessive force claim, the *Heck* doctrine is implicated in two circumstances: "[T]he first is when the criminal provision makes the lack of excessive force an element of the crime. The second is when excessive force is an affirmative defense to the crime, as was true in the case upon which the district court relied." *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010) (internal citations omitted).

---

[2] In fact, given this admission, Ruemenapp is likely judicially estopped from now arguing that he did not resist or obstruct Alexander. *See Bolden v. City of Euclid*, 595 F. App'x 464, 469 (6th Cir. 2014).

Ruemenapp argues that neither of those circumstances are implicated here. Defendants do not appear to contest that assertion. But even assuming it to be true, Ruemenapp's argument simply underscores that he is not contesting the underlying legality of the arrest.

**2.**

Accordingly, the issue to be decided is narrow: whether the force used during the lawful arrest of Ruemenapp was unreasonable. For several reasons, it was not.

The Sixth Circuit has held, in several cases, that officers may use force to "neutralize a perceived threat" while arresting an individual. *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008). In *Dunn*, the plaintiff led officers on a car chase and "then appeared to refuse to the Officers' commands to exit the car." *Id.* Given the plaintiff's recalcitrance, the Sixth Circuit concluded that "a reasonable officer on the scene would have believed that the threat posed by Dunn was not contained until Dunn was out of the car and handcuffed." *Id.* In *Wells v. City of Dearborn Heights*, the Sixth Circuit used similar reasoning to reject an excessive force claim. 538 F. App'x 631, 637 (6th Cir. 2013). In *Wells*, the plaintiff was kneed to the ground by the officer because of "Wells's apparent failure to drop to the ground quickly enough." *Id.* The *Wells* Court noted that Wells had cerebral palsy and reached for a love seat while trying to kneel, but concluded that a reasonable officer could have interpreted "Wells's failure to respond immediately . . . as his resisting arrest." *Id.* Similarly, in *Bolden v. City of Euclid*, the officer believed that plaintiffs were trespassing on private property and ordered them to get on the ground. 595 F. App'x 464, 466 (6th Cir. 2014). One of the plaintiffs started to walk away and pulled out a cell phone. *Id.* In response, the officer smacked the phone of the plaintiff's hand and threw the plaintiff to the ground, forcibly holding him down. *Id.* The *Bolden* Court rejected the

excessive force claim, explaining that the plaintiff's "refusal to comply with Officer Doyle's lawful commands justified the use of some force to control the situation." *Id.* at 470–71.

Like Ruemenapp, the plaintiff in *Bonner-Turner v. City of Ecorse*, was thrust head-first into a wall. 627 F. App'x 400, 413 (6th Cir. 2015). There, the plaintiff was already in handcuffs, which the officer was in the process of removing. *Id.* The plaintiff "tensed up," refused to follow commands, and threatened the officer. *Id.* In response, the officer pushed the plaintiff into the wall to control him. The Sixth Circuit held that "[n]o reasonable juror could find that the officers used excessive force in light of undisputed testimony that [the plaintiff] tensed up upon release of the first handcuff and refused to follow [the officer's] commands." *Id.*

Ruemenapp makes no attempt to distinguish these cases. In fact, he does not analogize to any Sixth Circuit cases. He simply points to two unpublished district court opinions. First, Ruemenapp cites *Bibbs v. Allen*, for the proposition that "the Sixth Circuit and district courts within this Circuit have repeatedly rejected claims that an officer reasonably used force to secure compliance with an order where the officer failed to give the suspect a reasonable chance to comply with the order." No. 13-CV-10362, 2014 WL 3956127, at *6 (E.D. Mich. Aug. 13, 2014). Second, Ruemenapp cites *McCaig v. Raber*, No. 1:10-CV-1298, 2012 WL 1032699, at *1 (W.D. Mich. Mar. 27, 2012), aff'd, 515 F. App'x 551 (6th Cir. 2013). In *McCaig*, the plaintiff testified that he made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy.'" *McCaig*, 515 F. App'x at 555. Despite that, the officer placed a handcuff on plaintiff's right wrist, "and then used a takedown maneuver to take Plaintiff to the ground before applying the handcuff to Plaintiff's left wrist." *McCaig*, 2012 WL 1032699, at *1. Upon that record, there was a genuine issue of fact as to the reasonableness of the force used.

As stated above, courts focus on several factors when analyzing the reasonableness of forced used while effectuating an arrest: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts must look to the totality of the circumstances, but must view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Even construing all facts in a light most favorable to Ruemenapp, there is no genuine issue of fact as to the reasonableness of the force used. Although the crime at issue is minor, Ruemenapp was belligerent and uncooperative (even by his own testimony). Ruemenapp's deposition testimony establishes that he refused to allow the officers access to Ms. Reker's apartment, used an obscenity, and gestured menacingly. Even though Ruemenapp contends he did not point directly at the officers, he also testifies that the officers told him to stop pointing at them. Ruemenapp Dep. at 85. Thus, even considering only Ruemenapp's testimony, the officers clearly perceived Ruemenapp as physically gesturing towards them. Given Ruemenapp's behavior, Alexander's belief that Ruemenapp was about to strike Sobolewski was reasonable. *Id.* at 49.[3]

According to Ruemenapp, he attempted to leave the officers and return to his house at one point. Ruemenapp Dep. at 84. Alexander blocked his retreat. *Id.* at 84–85. Ruemenapp also testified that, just before Sobolewski informed him that he was being arrested, Alexander attempted to grab his wrist. *Id.* at 86. In response, Ruemenapp dodged. *Id.* Then, Sobolewski told Ruemenapp that he was under arrest and that he should turn around and put his hands behind his

---

[3] Ruemenapp also testifies that he has no memory of what happened immediately after he was pushed into the wall. *Id.* at 86–87. Accordingly, he does not contradict Alexander's testimony that Ruemenapp was "moving his head back and forth, attempting to negotiate with myself and Officer Sobolewski [sic] about going to jail" after being pushed against the wall. Alexander Dep. at 52.

back. Ruemenapp Dep. at 86. Instead of complying, Ruemenapp started to ask why he was being arrested. *Id.* at 87. The officers then forced Ruemenapp into the wall and handcuffed him.

Like in *Dunn*, *Wells*, and *Bolden*, a reasonable officer could have interpreted Ruemenapp's actions as threats against the officers and/or attempts to resist arrest. Once an individual has been informed they are being arrested, officers should not be required to wait for a violent reaction before restraining the individual. Rather, when dealing with a belligerent and noncooperative suspect, officers may neutralize the threat while handcuffing the suspect by pushing him over a car, into a wall, or onto the ground. Ruemenapp argues that the officers should have given him time to comply with their order. *See McCaig*, 2012 WL 1032699, at *1. But given the confrontational nature of the conversation, Ruemenapp's threatening and evasive physical movements, and his failure to comply with Sobolewski's orders, the officers acted reasonably.

Because the force used was reasonable under the circumstances, there was no constitutional violation. For that reason, summary judgment will be granted for Defendants on the excessive force issue. But even if the Court concluded that a constitutional violation had occurred, Defendants would be protected by qualified immunity. Given the similar facts in *Dunn*, *Wells*, and *Bolden*, the unreasonableness of the force used was not clearly established at the time the arrest occurred. Because the unreasonableness of the officers' actions was not "beyond debate," they are protected by qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

**B.**

Ruemenapp also brings a *Monell* claim against Defendant Oscoda Township. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). To prevail upon a *Monell* claim, Ruemenapp would have to show that "the alleged federal right violation occurred because of a

municipal policy or custom." *Thurmond v. Cty. of Wayne*, 447 F. App'x 643, 651 (6th Cir. 2011). But that showing is premised on a finding that there actually was a federal right violation. *See Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."). Because no such violation occurred here, the Township cannot be held liable under *Monell*.

Even if a constitutional violation had occurred, Ruemenapp has not identified any facts which would suggest he suffered excessive force as a result of the Township's failure to train or supervise its police officers. "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

In this case, there is no evidence that either Alexander or Sobolewski has a history of violence during arrests. In fact, there is no evidence in the record that excessive force has been used by any Oscoda Township police officer in the past. And both officers received training on the use of force within the last year prior to the arrest. Given this historical backdrop, there is no evidence that the Township's training was inadequate, much less evidence that the Township has been deliberately indifferent to the insufficiency of its training. Ruemenapp's *Monell* claim will be dismissed.

## C.

Finally, Ruemenapp has filed a motion in limine and a motion to file exhibits in the traditional manner. *See* ECF Nos. 28, 29. Because all of Ruemenapp's remaining claims will be dismissed, those motions will be denied as moot.

**IV.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 21, is **GRANTED.**

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED with prejudice.**

It is further **ORDERED** that Plaintiff's motion in limine and motion for leave to file, ECF Nos. 28, 29, are **DENIED as moot.**

Dated: June 29, 2017                                   s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 29, 2017.

                                       s/Kelly Winslow
                                       KELLY WINSLOW, Case Manager